IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


MARCO CONTRACTORS, INC.,

              Plaintiff,

         vs.                    Civil Action No. 20-237

CITIZENS FINANCIAL GROUP, INC.,

              Defendant.

-----


   Transcript of Oral Argument held on Tuesday, September 14, 2021, in the United States District Court, 700 Grant Street, Pittsburgh, PA  15219, before Honorable J. Nicholas Ranjan, United States District Judge.

-----

**APPEARANCES**:

  For the Plaintiff:     Cafardi, Ferguson, Wyrick, Weis & Gabriel, LLC
                         by Christopher A. Cafardi, Esq., and William J. Wyrick, Esq.


  For the Defendant:     Reed Smith, LLP
                         by Perry A. Napolitano, Esq., and Justin J. Kontul, Esq.


  Court Reporter:        Noreen A. Re, RMR, CRR
                         700 Grant Street
                         Suite 5300
                         Pittsburgh, PA  15219

-----


   Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1               P R O C E E D I N G S

2                       -----

3          THE COURT:  We're here today for an oral argument on

4     Citizens' motion to dismiss.  Why don't we begin by having

5     counsel enter their appearances for the record.

6          MR. CAFARDI:  Your Honor, Christopher Cafardi on

7     behalf of Marco Contractors.

8          MR. WYRICK:  Also William Wyrick on behalf of Marco

9     Contractors, Your Honor.

10          THE COURT:  All right.  Good morning.

11          MR. NAPOLITANO:  Good morning, Your Honor.  Perry

12     Napolitano on behalf of Citizens Bank.

13          THE COURT:  Good morning.

14          MR. KONTUL:  Good morning, Your Honor.  Justin

15     Kontul, also on behalf of Citizens.

16          THE COURT:  Good morning, everyone.  So just one

17     housekeeping issue.  I'm fine with counsel while speaking if

18     you want to remove your mask.  That's fine by me.  If you want

19     to keep it on, that's also fine.  If you do keep it on, I do

20     ask that you speak up.  And you can feel free to speak from

21     your counsel table or use the podium.

22          My plan is just simply to have Mr. Napolitano go

23     first, and then Mr. Cafardi can respond, and I'm glad to hear

24     reply rebuttal from anyone.

25          So with that, Mr. Napolitano, would you like to

1    start?

2            MR. NAPOLITANO:   Thank you, Your Honor.   Thank you

3    for time in person today.   It's really good to be with all of

4    you today.   It feels good to be back in the courthouse.

5            Your Honor, the papers are pretty clear.   The case in

6    its entirety should be dismissed for, really, two principal

7    reasons that we lay out in our papers.

8            First, the Plaintiff executed documents in September

9    of 2014 that the law recognizes as the touchstone of the

10   relationship between a bank and its customers and in that set

11   of papers granted the Plaintiff's controller -- so they hired

12   and appointed her as the controller, Sue O'Neill -- gave her

13   the authority over Marco's accounts.   And those documents that

14   Marco executed in September of 2014 also ratified all of the

15   prior transactions made in those accounts up to that date.

16           Second, Your Honor, Marco executed general releases

17   in June of 2015 and 2017 in which it expressly released any

18   claims against Citizens, whether known or unknown, that

19   existed as of that date.

20           Now, Marco has admitted that these documents were

21   signed by its owner, Martin Smith.   And the allegations in the

22   amended complaint simply are insufficient to call into

23   question the effectiveness of these documents.   They're

24   binding, legal documents under the law of Pennsylvania.

25           So the Court dismissing this action now, Your Honor,

1    is the right thing to do at the right time, because the

2    dismissal would be consistent with well-established pleading

3    requirements and, frankly, would appropriately preserve the

4    parties' resources and the Court's resources and would limit

5    Marco's continued exposure pursuant to Citizens' counterclaim,

6    paying fees for Citizens in defending this action.

7           So starting with the signature cards, Your Honor --

8    and I'm sure Your Honor has read the papers.  And at any time

9    if you want me to focus on one thing or another, I certainly

10   would be happy to.  The opposition largely with respect to the

11   signature cards focuses on simply asking you not to look at

12   them.  No question about their authenticity.

13          And so the question then becomes, can you look at

14   them?  And that boils down to, really, whether they're

15   integral to the complaint.  And they clearly are.  Under

16   Pennsylvania law it is well-established that the legal

17   relationship between a financial institution and its

18   depositors is based on contract and that the contract terms

19   are contained in the signature cards and deposit agreements.

20   And that's in the First Federal Savings and Loan case, Your

21   Honor, that we cite in our briefing.

22          THE COURT:  Can I ask you, do I only have part of the

23   picture here?  I mean, I understand your argument that the

24   signature card agreement is integral here to the complaint and

25   also forms the basis of the parties' relationship.  When I

1    looked at the signature card agreement, it references a host

2    of other related agreements.  Some of those agreements might

3    have been teed up as part of the initial motion to dismiss.  I

4    can't recall, but I assume they probably were.

5           So you have this kind of package of agreements.  And

6    so if I'm only looking at the one signature card agreement, am

7    I improperly looking at just one piece of the puzzle?  Should

8    I be looking at the whole package of agreements, based on your

9    argument?  Maybe I erred when I said initially that I

10   shouldn't be looking at all these other agreements.

11          MR. NAPOLITANO:  Well, Your Honor, you certainly can

12   look at all of the other agreements for the reasons that we

13   stated in our initial motion to dismiss, but you certainly

14   also can look at the signature cards and see that they are

15   part of the contract.  And they are the part of the contract

16   that specifically identifies who the authorized persons were.

17   So I, frankly, think you would be on solid ground in either

18   event.

19          THE COURT:  I presume there's nothing, no argument to

20   be made -- it might be a question for Mr. Cafardi -- whether

21   or not the other agreements are somehow either inconsistent or

22   provide additional context or explanation or initial terms

23   that pertain to the authorized user part of it.  Or,

24   basically, is the position of the defendant this is

25   essentially consistent with the other agreements and it's

1      essentially a stand-alone agreement as well?

2              MR. NAPOLITANO:  Yes, Your Honor.  We don't think

3      there is anything inconsistent in the other agreements.  In

4      fact, we, as you know, attach them.  There's been no

5      indication of any suggestion that there is anything

6      inconsistent.  And, in fact, the truth of the matter is that

7      the contents of those other agreements provide additional

8      bases for dismissal of the claims.

9              THE COURT:  So if I consider these agreements or at

10     least the signature card agreement, more substantively the one

11     thing that gave me pause with respect to your argument is

12     whether or not it would necessarily result in dismissal of all

13     the claims.  Just because, as I understand the Plaintiff's

14     arguments here, some of them -- I think some of them related

15     to the idea that Citizens knew about this fraud, and they

16     didn't do anything.

17             And even though you have this authorization by

18     Miss O'Neill and ratification of the transactions, there're

19     separate and independent common law or statutory duties that

20     say, whoa, whoa, even though she's an authorized

21     representative, you needed to sniff out the fraud, offer these

22     other fraud detection measures.

23             And so I can envision Plaintiffs here arguing, well,

24     you don't need to consider it and stop short.  We have these

25     separate claims that have independent duties separate and

1    apart from this contract and even separate and apart from

2    whether or not she's an authorized user.  I don't know if you

3    can address that at all.  And I guess not to make this a super

4    compound question, but one of the claims, too, related to the

5    stop payment issue that -- I think it's Count 4 where they're

6    alleging that Citizens had a duty to stop payment in 2019,

7    after it was notified of the fraud.

8            So what in that claim, I suppose, also, survived at

9    least or at least would not be barred by the existence of the

10   signature card?

11           MR. NAPOLITANO:  Taking those one at a time, Your

12   Honor -- and thank you.  Those are very helpful questions.

13   With respect to the notion that Citizens knew about the fraud,

14   what you see throughout the complaint is reference to alleged

15   fraudulent activity in the account in 2013 and 2014.

16           And it's important to note that when you actually

17   look at those instances, that those alleged fraudulent

18   activities don't have anything to do with this case.  In other

19   words, they are not the alleged fraud on which the complaint

20   is based.

21           Those are instances of activity in the account where,

22   actually, authorized persons under the signature cards, Darrin

23   Patterson, for example, copying controller Sue O'Neill,

24   reached out to the bank to ask questions in late 2013.  And

25   then in January of 2014 the controller, Sue O'Neill, reached

1    out to the bank about an unsigned check.  And so those

2    allegations have absolutely nothing to do with the Plaintiff's

3    allegations of fraud that form the basis of the complaint.

4    Actually, what they show is the bank working with the

5    authorized persons on the signature cards.

6            And so it is actually the opposite of suggestive of

7    knowing there is some kind of a problem.  It is the controller

8    whose job, by definition, is to mind the financial store,

9    dealing with Citizens about issues that had arisen in the

10   account.

11           In terms of the fraud prevention measures, Your

12   Honor, actually, the allegations in the complaint explicitly

13   admit that Citizens on several occasions made Marco aware of

14   fraud prevention tools.

15           Now, some of those communications were directed at

16   the controller, but there's really nothing exceptional about

17   that.  That's exactly who is supposed to get those types of

18   indications.  And so, Your Honor, their complaint really

19   hinges on the idea and repeatedly resorts to the idea that

20   what Citizens needed to do was it needed to call the president

21   on a selected group of issues.

22           Now, otherwise, there is no indication that Sue

23   O'Neill wasn't the controller, wasn't an authorized person,

24   wasn't able to otherwise transact all kinds of business on

25   behalf of Marco.  Of course, she could, because she was the

1    controller.  Then their argument really is "But you didn't
2    tell the president."
3          Well, Your Honor, you know that the whole purpose of
4    signature cards, if you really think about the way this all
5    works in the real world, is for the banking customer to
6    identify to the bank who they can deal with.  On the Marco
7    side, it's necessary for the convenience of the company;
8    right?
9          Because, generally speaking, the president, the CEO,
10   is not involved in the day-to-day transactions and doesn't
11   want to have to stop every time a banking transaction has to
12   take place.  So what do they do?  They want to be able to
13   appoint authorized people.  And under the documents, they can;
14   and they did.  And under the documents that Marco signed,
15   those authorized people can actually designate still more
16   people to act on behalf of the company.  It only makes sense.
17         Now, on the bank side, the bank turns to face the
18   customer and says, "Right, you want to do business with us.
19   And I understand, Mr. Smith, you're not going to go calling up
20   the bank every time you want to make payroll.  So tell us who
21   it is that we can deal with so that we only deal with the
22   people that you say are okay."  And that's the signature card.
23   And that's where Mr. Patterson's name is.  That's where Sue
24   O'Neill's name is.
25         And so the entirety of the relationship is based on

1    that.  And so telling the controller "Here are some fraud

2    prevention tips.  We just had correspondence.  We've gone back

3    and forth on some things that were of concern to you, as the

4    controller.  Here are some tools that we have that can help

5    you beat the fraud, protect yourself against the fraud."

6             It is absolutely positively not actionable to not

7    tell the president of the company when you're doing all these

8    things.  There is just no basis in Pennsylvania law for that

9    to become actionable.  If it were, it would be disastrous.  So

10   that's what the complaint refers to.  That's what the brief in

11   opposition refers to.

12            There are dozens of references to not talking to the

13   president, and sometimes they'll say -- they'll turn the

14   phrase "without talking to the duly authorized person," Martin

15   Smith.  But what they're leaving out, what they don't want you

16   to look at today, is one of those duly authorized persons was

17   Sue O'Neill, who was the controller.  And it makes perfect

18   sense.

19            Once you get past that, Your Honor, there are

20   actually no specific allegations about what Citizens did

21   wrong, should have done better, because it all rests on "You

22   should have talked to the president."  And that's a

23   nonstarter.

24            Now, I do want to talk to you about those stop

25   payment questions, because those are also really good

1    questions, because they happened in 2019; and they happened

2    after the two releases.  We argued in the first motion to

3    dismiss and it continues to be true that those allegations

4    really don't state any facts that are required to state a

5    plausible claim under the Twombly and Iqbal standard.  What

6    they said is that they directed Citizens to stop payment on

7    all fraudulent checks.

8            Now, if you stop and think about what that means,

9    Your Honor, all that means is what any business would want.

10   "Hey, I hope nothing fraudulent gets through."  But a stop

11   payment order under the law and under the applicable

12   agreements requires more than that, because how is a bank to

13   know which checks to stop payment on?  And if it stops payment

14   on all checks, then Marco has a big problem, because it's not

15   paying its vendors.  It's not meeting its payroll.

16           So under the law, for good reason, if you're going to

17   ask the bank to stop payment, you've got to be specific.

18   You've got to say what the transaction is, what the wire, what

19   the check is.  And there is zero allegation about that.  It is

20   just more of this blanket pleading.  It's not appropriate.

21   This is the second go.  This is the second complaint, and it

22   hasn't been improved upon.

23           THE COURT:  Okay.  Thank you.  Just so I'm clear, I

24   mean, your position -- I guess this would be a different type

25   of complaint if the plaintiffs allege that Citizens had

1    knowledge that Miss O'Neill was the fraudster, was conducting

2    the embezzlement.  So maybe it's sort of a different scenario

3    where you have a situation where a bank is dealing with an

4    authorized user and then comes to know or suspect that that

5    authorized user is committing some type of fraud.  But that's

6    not alleged in this case; is that fair?

7          MR. NAPOLITANO:  It is not alleged in this case.

8    And, Your Honor, just because of the two complaints that we

9    have had in this case, I want to add that that would require a

10    specific pleading of facts that would support the conclusory

11    statement that Citizens knew about something that Sue O'Neill

12    was doing wrong; and had they done something differently, the

13    outcome would have been different.

14          It really requires a level of particularity -- and

15    that hasn't even been attempted -- to plead fraud.  And they

16    admit that they're not pleading fraud in this case, but they

17    are saying that the releases were procured or induced in bad

18    faith.  And they used the conclusory word "fraud" at one

19    point, but making no effort to plead with the particularity

20    required by Rule 9(b).

21          And that's very telling.  Because, as you'll recall,

22    we are here today on a second complaint, on an amended

23    complaint that was by design supposed to address those

24    releases.  They were the subject of a motion for judgement on

25    the pleadings, and the plaintiffs asked Your Honor not to hear

1    that motion.

2            You directed a response.  Rather than respond, they

3    amended the complaint.  And that was the product of a good

4    faith give-and-take by counsel on both sides to try to get to

5    the point.  And so that's where we are today, trying to get to

6    the point.

7            THE COURT:  You want to talk a little bit about those

8    releases?  As I understand the releases, they're broad; and

9    they would bar, according to the defendant's position, all of

10   the transactions that arose prior to the date of the last

11   release of -- pre-2017 transactions; is that right?

12           MR. NAPOLITANO:  That's correct.

13           THE COURT:  Is that the bulk of the case here in

14   terms of the damages component, as far as you know?

15           MR. NAPOLITANO:  It is, Your Honor.  And I apologize

16   for doing this, but just to be sure, if there's any remaining

17   open issue about you being able to look at the signature

18   cards, there was one case that we came across that I don't

19   think that we had brought to your attention previously.  And

20   if it's okay with you, I'll identify that case.

21           THE COURT:  Yes.

22           MR. NAPOLITANO:  So it is Reginella Construction

23   Company versus Travelers Casualty and Surety Company.  And

24   that's reported at 949 F Supp 2nd 599.  It's a 2013 case from

25   this district.  And in that case Judge Hornak said that it is

1    appropriate on a motion to dismiss to consider a contract at

2    that stage in order to "determine the extent to which a valid

3    contract between the parties governs the conduct at issue."

4           And in that case Judge Hornak said that plaintiff

5    could not bring claims against the defendant relating to

6    "alleged behavior during its business relationship, yet

7    protest the Court's full review of the legal nature of that

8    relationship.  Otherwise, a plaintiff with a legally deficient

9    claim could survive a motion to dismiss simply by shrewd

10   pleading."  That quote comes from 607 and 608 of the opinion.

11   Of course, we cited the Pension Benefit Guarantee case that is

12   to the same effect.

13          And so I'm happy to move on to releases, Your Honor.

14   But because we hadn't apprised you of that previously, I

15   wanted to make sure I pointed that out to you.

16          THE COURT:  Thank you.

17          MR. NAPOLITANO:  As to the releases, Your Honor, yes,

18   your question was, do they cover the bulk of the amount in

19   controversy?  And the answer to that is yes.  The post-release

20   allegations are conclusory, as I've indicated earlier.  And

21   I'm happy to talk about that in more detail, but the answer to

22   your question is yes.

23          THE COURT:  Okay.  I think I understand that.

24   Anything further you want to address?  I'll also give you a

25   chance to respond as well.

1        MR. NAPOLITANO:  No, Your Honor.  We would definitely

2   appreciate the opportunity to respond.  And that probably will

3   be most efficient, instead of me walking through my whole

4   hour.

5        THE COURT:  All right.  Sounds good.  Mr. Cafardi.

6        MR. CAFARDI:  Thank you, Your Honor.  So I do think

7   some context of the history of this case is appropriate; and

8   some is obvious from the docket, obviously, and some is not.

9   As Your Honor knows, we filed a pretty detailed complaint to

10  begin this case that Citizens filed a motion to dismiss on.

11  That motion was denied in its entirety.

12       We then engaged in a discovery process.  Citizens

13  asserts in their brief that they produced some 11,000 pages to

14  us, as if that's evidence of a full production and response to

15  the discovery request we served.  It is, in fact, not.  Those

16  are basically the statements that we had produced back to us.

17       Citizens completely stonewalled us on every discovery

18  request that we had with vague objections, which we tried

19  through a meet-and-confer process to resolve.  We were not

20  able to do so.  It was a lengthy process.  During the pendency

21  of the motion to compel and the meet-and-confer process for

22  that motion, Citizens asked for additional time to get back to

23  us and used that time to draft and file a motion for judgment

24  on the pleadings before meeting and conferring with us prior

25  to the filing of that motion.

1        That was their attempt to not respond to the

2   discovery that we had served.  We have now drafted a

3   significantly more detailed complaint, adding 50 additional

4   paragraphs of facts to the complaint we initially served to be

5   able to hopefully draft around what discovery objections they

6   have, that our allegations were too broad or too vague.

7        So we now have specific allegations in the complaint

8   tied directly to specific discovery requests we made so we can

9   point back to them and we hopefully get to the discovery

10  process here.

11       When we filed the amended complaint, Citizens then,

12  of course, filed a motion to dismiss, which we're then here on

13  today.  So that is the background.  This was not us running

14  from a motion on the pleadings.  This was us attempting to

15  engage in meaningful substantive discovery where we should

16  have been following the Court's initial order on Citizens'

17  initial motion to dismiss this case in its entirety.

18       So if counsel wants to talk about efficient use of

19  the resources, we have not done that thus far in this case

20  because of how they have chosen to litigate this matter.  Now,

21  that's their right.  But to claim efficiency at this point I

22  think is a bit disingenuous.

23       And tellingly, Your Honor, we think that the

24  discovery we're seeking is really, really important, because

25  Citizens did not produce to us any internal documents or

1     procedures.  And if those documents indicate -- and we believe
2     they will, based upon on an expert we have retained who has
3     experience in the banking industry and banking security, these
4     kind of procedures and the drafting of those manuals.  If
5     Citizens violated its own internal procedures in various
6     points of its relationship with Marco, that may have required
7     them to have direct communications with the president of
8     Marco, as opposed to simply an authorized signer.  Because we
9     don't have those documents, because they refuse to respond to
10    any of our discovery requests in a meaningful way, we don't
11    have the answer to that.
12         We believe that those documents we believe exist,
13    because our expert has told us they likely exist, would take
14    us well beyond the information and belief that we've had to
15    plead on different things in this matter so far.
16         To take Mr. Napolitano's two points, though, I'm
17    happy to answer, of course, any questions Your Honor has.  The
18    signature cards, we're not scared of having those looked at,
19    as he seems to suggest.  At this stage they're simply not part
20    of what the Court looks at in deciding a motion to dismiss.
21         It is very clear that that standard is -- the Court
22    may look at it, if it is undisputedly authentic and integral
23    or explicitly relied upon in the complaint.  It is not
24    integral or explicitly relied upon in the drafting of the
25    amended complaint before Your Honor today.

1          Your Honor in one of your questions to Mr. Napolitano
2    appropriately asked.  We plead that there are independent
3    duties separate and apart from those card agreements.  Those
4    are the negligence counts that we're pleading, that do get
5    into the PCC that we're pleading.  As a result, we are not
6    relying or referring to those signature cards in the counts
7    that we have raised.  That's why all of those counts will
8    succeed at this stage.  He wants to argue summary judgment
9    here regarding the amended complaint.  He doesn't get to do
10   so.
11         THE COURT:  I know that the complaint alleges, in the
12   alternative, a breach of contract claim.  Does that not bring
13   into what I look at now, then, the signature card, if there is
14   a contract?  Even though it's plead in the alternative, it's
15   still plead.
16         And so does the defendant have a point that while you
17   plead a contract claim, so I should -- the Court should be
18   able to look at the contract at issue.  Maybe an ancillary
19   question or an additional question to that is, what's the
20   contract that's at issue?  I think it's the last count of the
21   complaint.
22         MR. CAFARDI:  Sure.  And I think Your Honor's point
23   is the accumulation of agreements between the parties that are
24   the contract that governs this relationship.  It is not one or
25   several signature cards.  There are any number of agreements

1    here which we're alleging in the alternative Citizens may have

2    breached.  There are loan agreements.  There are loan

3    modification agreements.  We're not even sure the complete

4    extent of the agreements, frankly, because our records on

5    those may not be complete.

6          So it is the extent of all of those things that form

7    the contract between the parties, Your Honor, not simply the

8    signature card that Mr. Napolitano wants to point to.

9          So to answer Your Honor's question specifically, no,

10   I don't believe that pleading that in the alternative allows

11   you to look at only those things which he points to, because

12   there is a universe of additional agreements that govern that

13   relationship that are beyond and certainly not relied upon or

14   referred to in our amended complaint, which is the standard

15   before you here today.

16         As to the second point, the waivers, we do believe

17   that the Court has to look at the context in which those

18   waivers were obtained and what the intent of the parties was.

19   That's well-settled Pennsylvania law.  And we have plead very

20   specifically things regarding the context and procedures that

21   we believe Citizens improperly followed in obtaining the

22   signatures on those loan modification agreements, which

23   Mr. Napolitano is referring to as waivers.  That's what they

24   really were.  They were loan modification agreements.

25         And two of them that were signed that waive

 1    purportedly all existing known or unknown claims.  The

 2    circumstances regarding how those signatures were obtained and

 3    what Mr. Smith understood those agreements were, the Court

 4    needs to understand that context.  So we need more information

 5    on it to decide any of those issues regarding the waiver that

 6    can't be determined at this stage without that context.

 7         THE COURT:  I mean, I guess, if you can, maybe flesh

 8    that out a little bit for me.  Just going back to the

 9    procedure here a little bit, I did think that one of the

10    purposes here was for me to provide the parties clarity on the

11    release issue, because it had bubbled up as part of the motion

12    to compel, as well as the motion for judgment on the

13    pleadings.

14         So I've been operating under the assumption that the

15    amended complaint has set forth, really, the facts by which I

16    can essentially rule thumbs up or thumbs down on the release

17    issue at this stage.  I mean, I guess is your position that

18    there needs to be more discovery on the releases before I can

19    rule on them?

20         MR. CAFARDI:  Very clearly, Your Honor, yes,

21    regarding the context in which those releases were obtained.

22    We don't even know, Your Honor, right now if that was a

23    blanket release for some reason demanded of all Citizens

24    customers at that point in time for any reason, given a change

25    in management, given discovery of security issues, given

1    discovery of fraud on these specific accounts, whether it was

2    Marco alone that was requested to sign those agreements as

3    opposed to all Citizens customers.

4            All of that context and what Citizens knew at the

5    time and why they were asking Marco to sign those agreements

6    and how they asked them to sign it and how they obtained

7    signatures on them, all of that is relevant to whether those

8    waivers are enforceable or not.

9            THE COURT:  I mean, I guess -- if you can just flesh

10   out why you think the releases don't apply or I shouldn't rule

11   on them.  I guess your first argument here is that I need to

12   understand the context and circumstances better, and that

13   needs to be developed in discovery.

14           MR. CAFARDI:  That's correct.  And that's relevant,

15   Your Honor, as to any waiver obtained in Pennsylvania, what

16   the context and intent of the parties was in executing that

17   waiver.

18           THE COURT:  On that point, though, I expect

19   Mr. Napolitano to argue that "I don't have to.  You have a

20   contract.  You look at the four corners of the contract.  If

21   it's unambiguous, you interpret the contract; and there's an

22   integration clause."

23           So I'm precluded, in fact, from looking at any

24   extrinsic evidence or extrinsic statements.  Why can't I just

25   look at the release here to discern the parties' intent as

1    opposed to going to discovery?  Do you have the burden to

2    demonstrate something ambiguous with respect to the release

3    such that I would then have to look at extrinsic evidence?

4            MR. CAFARDI:  I don't think at this stage we do, Your

5    Honor.  But we have plead any number of factual paragraphs

6    regarding the context in which they obtained signatures for

7    those releases.  Those are the paragraphs that Mr. Napolitano

8    was referring to as a potential fraud claim that we have.

9            To be clear, we haven't plead fraud.  But the

10   signature may have been fraudulently obtained or induced on

11   those agreements, which is why we believe some discovery is

12   required for Your Honor to be able to touch those agreements.

13           THE COURT:  I guess the next question I had is the

14   legal bases by which you are arguing that the releases would

15   be invalid or unenforceable.

16           So from the complaint and from the briefs, there is

17   argument that there's potential fraudulent inducement, which

18   would be, I think, one argument you should be making for

19   trying to invalidate the releases.  And then there is a

20   reference to bad faith, which I interpreted it as related to

21   that fraudulent inducement claim.

22           Is there any, I guess, legal hook, other than

23   fraudulent inducement, by which you would be arguing that the

24   releases here would be unenforceable?  Typically black letter

25   law is that you can invalidate a release based on mistake,

1    fraud in the execution.

2            There is a couple exceptions under Pennsylvania law.

3    But as far as I can tell from the briefs and the amended

4    complaint, the basis is fraudulent inducement.  Is that

5    accurate?

6            MR. CAFARDI:  Well, it's not just fraudulent

7    inducement.  It's the intent of the parties as to the release.

8    And the intent of both sides is important there, Your Honor.

9    So that's why we need discovery to look into why Citizens was

10   asking for those loan modifications to be signed at those

11   specific periods of time for some reason.

12           Were they aware at that time of fraud on this

13   account?  Were they aware of general fraud issues when new

14   management took over?  Because that does match up with when

15   the modifications were requested.  Did they request it of all

16   customers at that point in time for that reason?

17           I'm not going to read our brief back to you, Your

18   Honor, but there are two or three cases that we think are

19   directly on point regarding that.  And the Three Rivers Motors

20   case reads:  "In construing a release, the foremost

21   consideration is the intention of the parties.  The intention

22   of the parties is gathered from the language of the release,

23   the four corners, and the circumstances surrounding the

24   execution of the release.  First, a Court must look to the

25   language of the release.

1            "In examining the language of a release, the terms of
2       the release will be given their ordinary meaning unless a
3       different meaning was clearly intended."  It goes on, "Next,
4       in determining the intent of the parties, a Court must inquire
5       into the circumstances surrounding the execution of the
6       release.  The surrounding circumstances clarify the intention
7       of the parties and identify matters which may be fairly said
8       to have been within the contemplation of the parties when the
9       release was given.  Only those matters within the
10      contemplation of the parties will be covered by the release."
11            THE COURT:  I guess can I ask you, let's say you take
12      discovery on this; and it turns out that you're right that --
13      and I think you maybe plead this or argue maybe that this was
14      a concerted clean-up effort, that Citizens Bank may have been
15      aware of fraud or suspected some type of fraud and attempted
16      to clean this up as part of the release.  And let's assume
17      that that's true and that was their intent to get you to
18      execute the release here.
19            I guess the question is, does that invalidate the
20      release, though?  You're both kind of sophisticated parties,
21      and each side needs to protect each side's respective
22      interest.  I mean, even if we discover all the circumstances
23      surrounding whether or not this was a concerted clean-up or it
24      applied to all of its customers or just to Marco, tell me why
25      that's legally significant.

1          MR. CAFARDI:  Yes.  We do believe that that context,

2     that potentially known intention of Citizens, would invalidate

3     that release.  We believe that their existing manual indicates

4     that they had certain duties that they did not follow.  We

5     believe certainly one of those duties would be if they were

6     aware of fraud, didn't disclose it to us and, instead, decided

7     to seek a release from us on those issues rather than disclose

8     them to us.  That context, we believe, based upon the cases

9     cited in our response, yes, would invalidate those releases.

10          THE COURT:  Okay.  Thank you.  I think I understand.

11          MR. CAFARDI:  That goes directly to the intent of

12     Citizens in obtaining the release.

13          THE COURT:  I mean, I guess where I may be a little

14     confused is I sort of understand that argument and those facts

15     as it pertains to your theory of the claims in this case, that

16     Citizens had duties to its customers and some of those duties

17     may be guided by industry practice as well as their own

18     internal policies you would get in discovery and discover they

19     violated those internal policies, they violated professional

20     norms.  And, therefore, these are the claims that may exist.

21          I guess the struggle I'm having is analytically is

22     that totally separate and apart from these releases?  Let's

23     say they violated all of their policies.  They've done all

24     sorts of wrongdoing in executing -- in bringing about these

25     releases themselves.

1          I don't think there are any claims in the complaint

2    that directly pertain to the releases.  I don't know if you

3    get what I'm driving at, but it's all in my mind -- I'm

4    compartmentalizing the two.

5          MR. CAFARDI:  I understand what Your Honor is getting

6    at.  I think it was our intent to have our negligence and PCC

7    claims cover that conduct.  You may not be reading it as such,

8    but they were certainly intended to cover that conduct, the

9    failure of Citizens to follow its own internal procedures and

10   well-known banking protocol.

11         And we drafted this very detailed complaint with the

12   help of a banking expert we've already retained and tried to

13   draft it to those specific concerns, which we believe very

14   strongly discovery is going to verify for us.  And we believe

15   it's why Citizens fought so hard to not disclose any of those

16   things to us.

17         THE COURT:  Okay.  Thank you.  I appreciate that

18   clarification.  Mr. Napolitano, you may respond.

19         MR. NAPOLITANO:  Thank you, Your Honor.

20   Mr. Cafardi's presentation began with the assertion that they

21   haven't gotten enough discovery.  And, as you know, we're here

22   on a motion to dismiss.  And what they've got to do is plead a

23   claim that satisfies Iqbal and Twombly.  But when Mr. Cafardi

24   told Your Honor that all we produced was statements, that is

25   dramatically inaccurate.

1            In their own brief at Page Footnote 1, they

2     acknowledge that Citizens produced not only bank statements,

3     but E-mails, letters between Citizens representatives and

4     Marco representatives, communications logs, charts and

5     occasionally documents attached to the aforementioned E-mails

6     and letters.

7            So it's not just statements.  It is the conversation

8     going on within Citizens and between Citizens and Marco.  And

9     those are the facts from which they presumably would draw

10     their case.  Policies and procedures are not the facts of the

11     case.  And so we did resist production of policies and

12     procedures, because banks generally resist the production of

13     those types of documents, but it has nothing to do with hiding

14     anything.

15            But the idea that we somehow didn't produce more than

16     statements is inaccurate.  And so we were very clear about

17     what we would and wouldn't do.  It is true that the

18     meet-and-confer was extensive, because we were trying to hone

19     in on something more.

20            We really did.  We worked to produce 11,000 pages for

21     that reason.  And it's simply -- you know, Your Honor, it is

22     just not true that we hoodwinked them somehow, that we asked

23     for more time and used that time to prepare a motion for

24     judgment on the pleadings.  We're capable of doing two things

25     at once.  I don't mean to be disrespectful.  But to use the

1    word "disingenuous," you should be sure that you're accurate.

2    And that is inaccurate and unfair.

3              We worked on the motion for judgment on the pleadings

4    because we thought it was an opportunity to shortcut the

5    litigation, because we think we have a right to win on the

6    grounds that were set forth in that motion and those releases.

7    That's why we did that, to avoid unnecessary discovery, which

8    is a fishing expedition.

9              Mr. Cafardi has now admitted several times that what

10   they plead is not enough, because he's told you he needs to

11   get discovery to get facts that he speculates with the help of

12   an expert that if he finds those facts, then maybe he can

13   challenge the releases.  But for the reasons you set forth in

14   the Benedum opinion and the lack of pleading here, he doesn't

15   get that discovery.  That's the definition of a fishing

16   expedition.

17             The 50 additional paragraphs were supposed to

18   describe facts to show why the releases don't apply, and they

19   don't do that.  And that's why the case should not only be

20   dismissed, but be dismissed with prejudice, because they made

21   their concerted effort to plead directly at that; and they

22   can't.

23             And they talk about the circumstances of the

24   transactions.  And there is a lot of allegations about

25   information, even as to things that were within Mr. Smith's

1    knowledge.  He signed the documents.  He knows.  And so to say

2    it was presented to him on a take-it-or-leave-it basis, that

3    says nothing.  I mean, it's belied by the writing.  The

4    writing controls, and the writing said that he had a chance to

5    look this over and talk with counsel.

6           And why is he pleading that on information and

7    belief?  He was standing right there.  It doesn't hold water.

8    The policies and procedures for the reasons you indicate

9    simply don't matter.  They essentially admitted that they

10   haven't yet stated a claim, and this is after two trials.  One

11   specifically focused on the releases.  And I should say we're

12   referring to these as releases, but Mr. Cafardi is right.

13   They were loan modification agreements, and both parties got

14   something out of them.

15          One of the things Marco got was continued credit and

16   continued credit on more favorable terms.  And so the bank did

17   get a release.  When Mr. Cafardi says, "I want to discover

18   what the bank intended by getting a release," I assure you the

19   bank intended to get released.  That's the whole point of the

20   document.

21          Now, Mr. Cafardi mentioned that you were curious

22   about the balance of the agreements.  And he said, "You're

23   right, Your Honor.  There is more to this, and you have to

24   look at all of these other agreements."  I told you earlier

25   why you can, but you don't have to.  But the irony here is we

1    placed those agreements before you before.  And at that stage
2    Mr. Cafardi told you not to look at them.

3          Now he's saying this motion is deficient because
4    they're not included in the motion.  They've never said that
5    any of these agreements aren't their agreements or don't apply
6    or aren't authentic.  In fact, they authenticated virtually
7    everything we're talking about.

8          They're just saying don't look at it, and that's not
9    the law.  You're correct that there is a contract claim.  And
10   for that reason alone you're supposed to look at the contract.
11   In addition, all of the allegations in the contract claim are
12   the same as the allegations supporting the negligence claim.
13   And their own briefing admits that their case is about
14   unauthorized transactions, because they argue that it's about
15   more than that.

16         So we know it's about unauthorized transactions, and
17   that's why who is authorized is integral to the complaint.
18   They simply haven't plead enough about the releases.  But to
19   your point about whether it matters, it doesn't.  Because
20   under the Benedum case, which was your case, Your Honor, a
21   fraud in the inducement claim was specifically dismissed.  And
22   you wouldn't look at parol evidence, because you're not
23   supposed to under the law in these circumstances.

24         They've attempted to plead the circumstances.  A lot
25   of stuff about information and belief and, frankly, a lot of

1    stuff that doesn't matter.  Saying that a bank offered you

2    more credit on a take-it-or-leave-it basis is not actionable.

3    You can go down the street and see if you can get a better

4    deal.  And I don't mean that to be flippant.  I just mean to

5    say that's business.

6         Now, Martin Smith signed these documents.  He knows

7    what the circumstances are, and he plead what he could plead.

8    I'm trying to skip through, Your Honor.

9         THE COURT:  That's fine.  I guess one question is --

10   you may have touched on this.  But, obviously, for plaintiff's

11   argument here that -- I think it's the Three Rivers Motors

12   case.  That in interpreting the leases that I have to also

13   view the circumstances surrounding the execution of the

14   release, which would require some discovery on that.  I don't

15   know if you can address that argument.

16        MR. NAPOLITANO:  Yeah.  They're conflating two

17   concepts.  The circumstances surrounding the release that

18   would inform the intent of the parties is one concept.  And

19   the intent of the parties could not be more clear, because the

20   language is so intentionally broad.  It's a general release to

21   all things known and unknown.

22        So there is nothing about the circumstances that

23   they've plead that gives any indication that there is any

24   other intent.  But they're conflating that with the

25   surrounding circumstances that they're trying to use to say,

1   okay, even if that's what the words mean, don't enforce it for

2   some reason.  But you already identify that the black letter

3   law is you got to have -- what?  Fraud, duress, mutual

4   mistake.  They don't have any of that.  They haven't plead any

5   of that.  The one thing they did was sort of throw in offhand

6   a conclusory statement of inducement by fraud.  That runs

7   smack dab into the hood ornament, as Benedum runs that

8   argument right over.  So in terms of the circumstances,

9   they're conflating those two concepts; and they just don't

10  hold up.

11          The language is plain and clear.  And there's no

12  pleading to support inducement by fraud, even if you're

13  inclined to consider the parol evidence, which you're not

14  supposed to under the Benedum decision.

15          What this really amounts to, Your Honor, is them

16  hazarding a guess and saying, "We need discovery to figure out

17  whether or not our guess is right."  That's simply not

18  satisfactory under the pleadings standard.

19          I'm looking through my notes to see if there's

20  anything else.  I mean, Your Honor, the idea that somehow

21  Citizens thought it might have exposure and, therefore, sought

22  a release, it can't be the law that a party's release is only

23  good if it thinks it doesn't have any exposure.

24          I don't know of any facts that suggest any exposure,

25  but a release is a good idea when you're giving more favorable

1    terms and making concessions and lending more money.  It

2    doesn't suggest anything wrong.  And what they've told you

3    about is really stretch speculation about a possibility.  And

4    that's, as you know, not plausible under the pleading

5    standards.  They got to plead circumstances that, if proven,

6    would overturn the release; and they haven't done that.

7         THE COURT:  I guess that touches on the question I

8    asked, which is let's assume plaintiff is right here and that

9    this was just a concerted clean-up effort by Citizens, whether

10   that would invalidate the release.  I take it the defendant's

11   position is no.

12        You take discovery.  And it turns out that Citizens

13   says, "Yeah.  We knew all about it.  That's why we entered

14   into this lease.  We wanted to clean up all our -- the risks

15   of a potential fraud claim."  Is that a basis to invalidate

16   the lease?  Or is that still a permissible enforcement release

17   at that point?

18        MR. NAPOLITANO:  It is still an enforceable release.

19   To accept plaintiff's approach to this would mean that all

20   releases would be up for grabs.  They would just never be

21   enforceable, and that's not the norm.  This speculation about

22   a clean-up effort is just that.  It's literally just

23   speculation and saying that Citizens had issues across the

24   bank, and this relationship in Western Pennsylvania was part

25   of a broad clean-up, and that's why they wanted this release.

1     That's wildly speculative, not fact based, but also not

2     relevant.

3          The other thing I should say, Your Honor, is there

4     has been no argument about the resolution that was signed in

5     2014 that ratified all of the transactions up until that date.

6     There has been no opposition on that at all.  So I wanted to

7     point that out so it doesn't get lost in the shuffle.

8          THE COURT:  Okay.  Thank you.  Anything further?

9          MR. NAPOLITANO:  No, Your Honor.

10         THE COURT:  All right.  Mr. Cafardi, anything

11    further?

12         MR. CAFARDI:  Mr. Wyrick is going to reply, if you

13    don't mind, Your Honor.

14         THE COURT:  Yes.  Mr. Wyrick.

15         MR. WYRICK:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. WYRICK:  So, Your Honor, just a couple of quick

18    points with respect to the release itself.  First, the

19    argument that if you can look at the circumstances surrounding

20    the execution of the release, then no release would ever be

21    enforceable, seems to imply that you should never look at the

22    circumstances surrounding the execution of a release, because

23    they're all simply enforceable and that logical corollary

24    simply doesn't work.

25         That's why the Court is required to look at the

1   circumstances surrounding the execution of the release, in the

2   first place.  Secondly, Your Honor, with respect to whether

3   the releases would be enforceable, even if you're looking at

4   them in this context, there is a bit of a circular argument

5   here, because Marco has plead that it was unaware of the fraud

6   that was being conducted by its own controller at the time

7   that the release was signed.  Not should have known about it

8   but didn't.  Just didn't know about it.

9        We've also plead that at least upon information and

10  belief that Citizens may have and that -- and even if it

11  didn't, that maybe it should have known because of its

12  violation of its own internal practices and procedures.  I

13  realize it's somewhat circular, but we have plead it and plead

14  it as best we can.

15       So the idea that the release releases unknown claims

16  that are specifically being concealed -- and, again, if you

17  assume the wrongdoing, specifically being concealed by

18  Citizens in the first place, then, frankly, looking at the

19  circumstances surrounding the execution of the release,

20  including what does Citizens know as it walks into the office

21  of Mr. Smith and says, "We need you to sign this, not because

22  we think there is potential fraud claims out that we want

23  releases on," that's just some boilerplate in here, in this

24  loan modification agreement.  That's incredibly relevant to

25  whether or not those releases are enforceable.

 1            THE COURT:   I guess it's relevant -- the way you're

 2    explaining it would be relevant if you could invalidate a

 3    release based on fraudulent inducement.   My understanding of

 4    Pennsylvania law is that Pennsylvania law says parol evidence

 5    applies -- I'm sorry, that the parol evidence rule applies.

 6    You have a fully integrated contract.   And if you're alleging

 7    fraudulent inducement, there are statements made or concealed

 8    that would induce the other party to enter into a release,

 9    that's not a basis to invalidate it.

10            So if you're -- I guess help me understand that a

11    little bit.   Is that the crux of your claim that if you take

12    discovery, the release could be invalidated because Citizens

13    fraudulently induced Marco into entering that release?   And if

14    that is the crux of it, how do you get around some of that

15    case law?

16            MR. WYRICK:   Well, Your Honor, I think the issue is

17    actually -- I hope this is responding to your question.   I

18    think the issue is actually whether the release, regardless of

19    how it's drafted to be broad, can specifically cover release

20    of claims that are undiscovered by Mr. Smith at the time.   And

21    that goes to the intent of the parties.   Again, the case law

22    says you need to look at the circumstances surrounding the

23    execution of the release.

24            And so those circumstances include those things.   I

25    understand your question regarding parol evidence, but I don't

1      know how you reconcile those two things without looking at

2      those circumstances.   And when you look at those

3      circumstances, they may lead the Court to conclude that this

4      release is enforceable.

5            To refer to it as parol evidence, I would only

6      suggest the case law suggests the Court is supposed to look at

7      that.   The Three Rivers case specifically says that.

8            THE COURT:  I'll definitely take a look at Three

9      Rivers.   I guess I'm just thinking back to a regular contract.

10     Maybe a release stands on different footing, but I would think

11     for just a regular contract I would look at the contract.   And

12     if it's unambiguous and it's fully integrated, I interpret it.

13     But if it's ambiguous to some extent, then I would look at

14     other circumstances or evidence to determine whether or not

15     that would assist me in discerning the parties' intent.

16           Is that what some of this case law contemplates?

17     Again, I'll have to look at it.   I haven't read through some

18     of those cases yet.   Do these cases contemplate a different

19     mode of interpretation?

20           If I have an unambiguous release, I don't just look

21     at the plain language.   I look at the plain language.   I look

22     at the circumstances.   And then at that point I discern the

23     parties' intent as to the scope of the release.   Is that your

24     position, basically?

25           MR. WYRICK:  I think that's correct, Your Honor.

1          THE COURT:  So releases stand on special or different

2     footing?

3          MR. WYRICK:  Well, Your Honor, when you think about

4     the context of a release, that actually makes some sense,

5     doesn't it?  That one party that knows it's engaged in conduct

6     that creates liability reaches out in a context where the

7     other side doesn't know that and provides an entirely

8     different reason to sign this agreement, it smells, for lack

9     of a better way to describe it.

10          THE COURT:  I agree with you, but -- I mean,

11     Pennsylvania law seems to bless the idea that one party can

12     come to the other with not -- basically straight-up fraud

13     inducing the other side to enter into a release.  And I would

14     have to look back, but I would imagine that the rationale

15     behind that is when you have two sophisticated parties, you

16     can protect yourselves, X and T, by negotiating terms of a

17     release that would, for example, protect against unknown or

18     known claims.

19          Marco could have carved out of the scope of the

20     release unknown claims or claims that cannot be discovered.

21     My sense of Pennsylvania law is that even though it seems it

22     doesn't smell right, I think the Pennsylvania courts have

23     blessed that idea of one side being able to essentially

24     fraudulently induce the other side in signing a release that's

25     fully integrated, but then is, nonetheless, enforceable, at

1    least a contract that's fully integrated and enforceable.

2          So I'll take a look at the cases again, but I think

3    if you're arguing more classic examples for invalidating a

4    release would be -- fraud in the execution I think is the

5    example.  From my take of the complaint, that's not plead,

6    fraud in the execution, where they slipped Mr. Smith an extra

7    page or something like that.

8          MR. WYRICK:  Well, Your Honor, it's not a question of

9    slipped him an extra page, although I think it would be fair

10   to say that executing a release was not under the

11   circumstances of execution of this -- of the loan modification

12   agreement, that it wasn't Mr. Smith's intention to be signing

13   a release of claims that he knew about or didn't know about.

14         He was signing a loan modification agreement.  And so

15   that's a bit of a touchstone, because he wasn't -- they didn't

16   walk in and say, "Hey, we have this release that you need to

17   sign to continue to do business with us."

18         It's "Hey, we need you to sign this loan modification

19   agreement so you can keep the line of credit that you're

20   using."  And so I suppose, Your Honor, that I'm not sure that

21   it's clearly plead.  Just in response to your question.

22         THE COURT:  And I think what you're driving at there,

23   though, is a different legal hook or legal principle which

24   would be unconscionability.  Another way to invalidate any

25   type of contract would be to argue that it's unconscionable.

1    There is maybe a reference to take-it-or-leave-it or the

2    release is buried on the second page.  That sort of thing.

3         But that to me was not -- and I guess it was a

4    question I intended to ask, because that wasn't fleshed out

5    enough such that I thought that Marco was asserting that the

6    loan modification agreement or the release contained therein

7    was procedurally and substantively unconscionable.

8         MR. WYRICK:  I think that to some extent that might

9    be inferred from the pleading of the circumstances that did

10   take place in the amended complaint, Your Honor.  But I think

11   that you're correct.  Certainly the word "unconscionability"

12   has not been used in the amended complaint.  You're not wrong

13   about that.

14        THE COURT:  Help me out a bit, then, just in terms of

15   what's plead and what's also briefed.  Because when I looked

16   at the release -- obviously, I'm focussed on releases here.

17   In part, I think they're teed up through this motion to

18   dismiss and also based, I think, on the agreed-on procedure

19   that I think it makes sense for me to look really closely at

20   them at this stage.

21        From just the complaint and the briefs, how I

22   understood Marco's position is the language of the release

23   does not apply here, because it only applies to claims that

24   are accrued.  And these accrued claims were discovered much

25   later, No. 1.  And then, second, they should be invalidated

1      based on the bad faith that Citizens had induced Marco to

2      enter into the release, including concealing from Marco some

3      of the facts or fraud that it was aware of or should have been

4      aware of.  And that was from my reading -- I'm sorry.  Third

5      was an averment that it was interpreted in a "take-it-or-

6      leave-it" fashion.

7               MR. CAFARDI:  Correct.  Without using the word

8      "unconscionability," Your Honor, the second and third points

9      you mentioned are an attempt to reference those circumstances.

10     And why the context and how those loan modification agreements

11     were presented to Marco is important for the Court to know

12     before it rules on an issue like this at this stage.

13              THE COURT:  So if that's the case, if I'm remembering

14     my unconscionability law, you have to establish both

15     procedural and substantive unconscionability.  Procedural

16     would be the circumstances surrounding the execution were so

17     one-sided -- if I'm remembering this right, the refrigerator

18     salesman shows up at a person's door, if you remember from law

19     school, and then hands him a one-page document.  And they

20     enter into some long-term installment contract to buy a

21     $100,000 refrigerator.

22              So there is an unequal bargaining position or

23     something around the circumstances of the interaction between

24     the parties that made it procedurally unconscionable.  And

25     that's one.  And then you have to also establish substantive

1    unconscionability.  There is something so substantively

2    one-sided and shocking about the agreement itself such that it

3    should not be enforced.  And so I do appreciate that like when

4    you throw out a "take-it-or-leave-it," it's maybe a signal for

5    unconscionability.

6            MR. CAFARDI:  That's another law school term, Your

7    Honor.  It's an adhesion contract.

8            THE COURT:  That gets to the question of whether or

9    not --

10           MR. CAFARDI:  And that was the circumstance here.

11   Both of the loan modification agreements were presented so

12   that the line of credit relationship could continue, and it

13   was a "take-it-or-leave-it" regarding those.  The other

14   important context of those was both of these agreements

15   lessened the reporting requirements that O'Neill had for

16   financial documents to the bank.

17           And that was a -- again, this is context, Your Honor,

18   which is why it's important to get to the discovery phase.

19   She had such an issue complying with the bank's regulations

20   for reporting to it, and the bank never referenced those

21   things to Mr. Smith at all.  They kept kind of sweeping it

22   under the rug and changed the terms of the loan to allow her

23   to have lesser reporting requirements to them, which are what

24   those 2014 and 2017 loan modification agreements included,

25   lesser reporting requirements.

1          It all goes to the context of why he would be asked

2    to sign those agreements and what, if anything, they cover in

3    language buried within them, not specifically disclosed.

4          THE COURT:  Okay.  I do think -- and certainly,

5    Mr. Napolitano, I'll give you a chance to reply.  But because

6    this wasn't, I think, briefed in any detail, it may make sense

7    to have some kind of post-argument supplemental briefing by

8    both sides to lay out this what I would think is the

9    unconscionability argument that's been presented so that the

10   record is clean as to both sides.  I'll give defense an

11   opportunity to respond to specifically what's being argued on

12   that front.  Mr. Napolitano?

13         MR. NAPOLITANO:  Thank you, Your Honor.  Mr. Wyrick's

14   argument again conflated the two concepts around looking at

15   the surrounding circumstances of the signing of the loan

16   modification.  What he began talking about was looking at the

17   circumstances to try to ascertain the parties' intent.

18         And there is really no indication anywhere that the

19   parties had any intent other than that which was reduced to

20   writing in a fully integrated contract, which specifically

21   said that Mr. Marco, who is the president of a company and a

22   sophisticated businessman, had a chance to read it and to

23   confer with counsel.  There's no other indication.

24         Those cases that they're talking about, Your Honor,

25   go to trying to discern the parties' intent in the sense of

1    whether the release covers the claim at issue.  But there is

2    actually no issue about that here.  It is crystal clear that

3    the language of the release covers this specific claim.  So

4    speculation about the parties' intent from surrounding

5    circumstances has no place here.

6         In terms of inducement, as you pointed out, the parol

7    evidence rule would bar that evidence.  And we've talked a lot

8    about the wild speculation that this was all designed to

9    hoodwink Mr. Marco.  It's at least as likely that it was a

10   business transaction in which Marco got something, more

11   financing and a break on the reporting requirements, which by

12   their own admission their company had a hard time meeting.

13        So a long-time client who is well-known and known to

14   be cash rich is not meeting the reporting requirements, and

15   the bank reduces them in its judgment to continue the lending

16   relationship and takes a release and which there is absolutely

17   nothing extraordinary about that.

18        No matter what you try to say and speculate about

19   that might have been wrong, they struggled to raise a mere

20   possibility that that is one thing that could have happened;

21   and that doesn't satisfy the pleading standard.

22        There is no allegation here, Your Honor, that

23   Citizens knew, so that statement is not accurate.  There is no

24   allegation of concealment.  What they're telling you is "We

25   might get evidence" and telling you that they are

1   acknowledging to you that they have not plead any facts to

2   support these theories.  And that kind of hypothetical

3   pleading is exactly what Iqbal and Twombly are designed to

4   prevent.

5          This is the second go, so they've certainly had ample

6   opportunity.  They're capable lawyers.  And releases all the

7   time say "known and unknown" on purpose.  And the law enforces

8   them on purpose because of the consequences of not doing so.

9   If the modification was presented on a "take-it-or-leave-it"

10  basis, first of all, that is -- it's extraordinary that that

11  is plead on information and belief when Mr. Smith signed it.

12         There are no facts to support what "take-it-or-

13  leave-it" means.  And the law allows "take-it-or-leave-it,"

14  because you can go down the street and get financing

15  elsewhere.  And the contract, Your Honor, says the exact

16  opposite.  The contract says that he's had the opportunity to

17  look it over and to get advice about it.

18         Mr. Wyrick said it wasn't Mr. Smith's intent to

19  release all claims known or unknown.  But if you sign a

20  release that says that, and that says you've had a chance to

21  read it, and there's no indication that's not the case, and

22  this is a sophisticated businessman who is pleading those

23  circumstances on which you participated on information and

24  belief, that pleading falls short.

25         There is an integration clause, and it's clearly not

1    -- there are no facts plead to support any of these theories.

2    And there is no fact to infer unconscionability.  Your

3    recitation of the requirements to show unconscionability, if

4    you juxtapose those with what has been plead, again, all you

5    get is wild speculation.

6           We certainly can brief that, Your Honor.  But there

7    has been nothing plead, nothing factually that would support a

8    claim of unconscionability.  And we've now had a second

9    complaint and briefing, and now today at argument we're now

10   groping for an inference that cannot be drawn.  If it was

11   there, it would have been briefed and argued before.

12          And I think the briefing explains why the cases that

13   plaintiff cites about when releases weren't enforced and those

14   cases dealing with personal injuries that arose by events

15   after the fact, after the date of the release, I think the

16   distinction in the briefing is pretty clear on those cases and

17   that would apply.

18          THE COURT:  All right.  Thank you.  Last word,

19   Mr. Cafardi?

20          MR. CAFARDI:  I would like to take up Your Honor's

21   offer to brief that argument just so it is clear for the

22   docket.

23          THE COURT:  All right.  Sounds good.  What I'm going

24   to do, I'm going to order a copy of this transcript with the

25   cost to be split between the parties.  I think it might be

1      helpful to have it -- it would be helpful to me and helpful

2      maybe for both sides, to the extent that anyone wishes to file

3      a post-hearing brief.  Maybe confer with Ms. Re as to the

4      timing of that.

5              And then my thought would be I would issue a briefing

6      schedule such that plaintiff would go first and file any kind

7      of supplemental brief in which you would lay out that

8      unconscionability or unenforceability type argument so that

9      I'm clear exactly what the legal basis is for plaintiff's

10     position that the releases should not be enforced.

11             Then I'll give the defendant an opportunity to

12     respond a few weeks later.  And then I think at that point the

13     record should be pretty clear, and I'll decide the motion.

14     Anything further, Mr. Cafardi?

15             MR. CAFARDI:  Can I just ask for a bit of time with

16     the Court's understanding to get that brief to you, Your

17     Honor?  I'm on a trial docket in Broward County, Florida.

18     We're a relatively small office.  It's taking up a lot of my

19     calendar.  We really couldn't even get to drafting that brief

20     until probably the first week in November, based upon that

21     trial docket.  We were supposed to be on this one.

22             We've now been pushed, I believe, to a docket that is

23     October 4th through 24th.  We could be at any point in there.

24     We'll get to this as soon as we absolutely can.  Both myself

25     and my associate on this matter are on that exact same matter

1     down there.  It's a four- to five-day bench trial.

2           THE COURT:  Okay.  I mean, I'm fine.  Any objection

3     to that, Mr. Napolitano?  It's a little bit longer than I

4     would have hoped, but I appreciate his conflicts, too.

5           MR. NAPOLITANO:  No objection, Your Honor.

6           THE COURT:  All right.  Thank you.  I'll get out a

7     briefing schedule.  I think that should be sufficient for the

8     transcript.  We'll have plaintiff's brief due at some point in

9     November.

10          MR. CAFARDI:  Thank you very much.

11          THE COURT:  And give the defendant a few weeks

12     thereafter to file a response.  Certainly I would like to get

13     moving on deciding.  I apologize for taking this long to

14     schedule this.  I'll get it out shortly before the end of the

15     year on this.  Anything else, Mr. Cafardi?

16          MR. CAFARDI:  No, Your Honor.

17          THE COURT:  Mr. Napolitano?

18          MR. NAPOLITANO:  No.  Thank you again.

19          THE COURT:  Thank you.  Appreciate it.  Very well-

20     argued.  And thanks.  It was nice seeing everybody in person

21     as well.

22          MR. CAFARDI:  Likewise.

23          MR. NAPOLITANO:  Likewise, Your Honor.

24          (Whereupon, the above-captioned matter was

25     concluded.)

1                                    -----

2

3                          C E R T I F I C A T E

4              I, NOREEN A. RE, RMR, CRR, certify that the
   foregoing is a correct transcript from the record of
5  proceedings in the above-entitled case.

6

7
   s\ Noreen A. Re                    October 13, 2021
8  NOREEN A. RE, RMR, CRR             Date of Certification
   Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25