IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARCO CONTRACTORS, INC., | |
| Plaintiff, | 2:20-CV-237-NR |
| v. | |
| CITIZENS FINANCIAL GROUP, INC., d/b/a CITIZENS BANK, | |
| Defendant. | |

**OPINION**

**J. Nicholas Ranjan, United States District Judge**

Marco – a general contractor – brings this suit against Citizens Bank, alleging that Citizens failed to prevent and report embezzlement over the course of their banking relationship. The case arises from Marco's discovery that Sue O'Neill – its controller and principal point of contact for the bank – embezzled approximately $8.7 million from the company's Citizens accounts over ten years. Ms. O'Neill was convicted of federal crimes related to her embezzlement, and Marco now seeks to hold Citizens Bank liable for the financial damage her actions caused. It alleges that Citizens breached duties to Marco by failing to investigate suspicious activity, failing to report possible fraud to other Marco officials, lowering reporting requirements, and committing other allegedly negligent acts or omissions.

Citizens now moves to dismiss all claims. First, it argues that Marco released it from liability when it executed two release agreements over the course of their banking relationship. Second, it asserts that Ms. O'Neill was an authorized user of the accounts, so Citizens was entitled to rely on the legitimacy of her actions.

After carefully considering the parties' arguments, the Court will grant Citizens's motion in part and deny it in part. Citizens is right that the two broad

releases Marco signed bar any claims arising before June 16, 2017 – the operative date in the second release. Marco's arguments to circumvent or invalidate the releases are unsupported by Pennsylvania law, as discussed more fully below. Therefore, the Court will dismiss all of Marco's claims in this case that accrued on or before June 16, 2017. But the signature cards and resolution agreement that show Ms. O'Neill's authorized status do not preclude liability for claims arising thereafter. That's because Marco's claims are predicated on duties that, as pled, are broader than those encompassed by the signature cards or resolution. Therefore, any post-June 16, 2017, claims may proceed.

## FACTUAL BACKGROUND

Accepting the amended complaint's allegations as true – as the Court must at the motion-to-dismiss stage – the relevant facts are as follows.

Marco and Citizens's business relationship began in the early 2000s, when they signed an Agreement for Cash Management Services. ECF 64, p. 4. Ms. O'Neill became a 'duly authorized' representative in 2007 after forging the signature of Marco's president and CEO, Martin Smith. *Id.* at p. 5. As Marco's Controller, she also had inherent authority to deal with Citizens. ECF 44, p. 3. Beginning in 2008, Citizens exclusively dealt with Ms. O'Neill on multiple occasions. First, in November 2008, Citizens sent Ms. O'Neill – and only Ms. O'Neill – information about fraud-preventative key fobs. ECF 64, p. 6. After forging Mr. Smith's signature again, Ms. O'Neill received three key fobs herself. *Id.* In 2009, when Mr. Smith signed a Note for a $500,000,000 line of credit, Citizens did not mention any account changes to him. *Id.* at p. 7. That same year, Ms. O'Neill began embezzling money. *Id.* at p. 17.

Citizens first became aware of certain suspicious or fraudulent activity on the Marco account in 2013. On March 31, 2013, for example, Ms. O'Neill provided Citizens with a balance sheet that was nearly $100,000 off balance and submitted other financial information late. *Id.* at p. 7. Later that same year, Marco's AP/AR

Manager told Citizens about five fraudulent checks that had cleared, including one for over $50,000, and warned Citizens that it should look out for more. *Id.* at pp. 7-8. According to Marco, however, even after Citizens learned of this suspected fraud, it did not suggest that the affected accounts be closed, nor did it inform Mr. Smith of the problem. *Id.* at p. 8.

On September 4, 2014, Citizens detected more fraudulent activity in Marco's accounts. *Id.* at pp. 9-10. The Operations Analyst at Citizens told Marco's Relationship Manager at Citizens to place the account on a watchlist and alert Marco; once again, Ms. O'Neill was the only individual informed. *Id.* at p. 10. Around that same time, Marco officially added Ms. O'Neill as an authorized signer for two of its accounts. ECF 66, p. 2.

Marco also executed a General Deposit Resolution Agreement – a Citizens form wherein Marco authorized Ms. O'Neill to act on Marco's behalf, including opening accounts, contracting for services, signing documents respecting any funds, making withdrawals, etc., "without inquiry as to circumstances of the endorsement or lack of endorsement." *Id.* at p. 3.

On July 10, 2015, Marco and Citizens signed a note modification that lowered reporting requirements and, as significant here, included a general release of any claims, known or unknown, that Marco might have against Citizens. ECF 64, pp. 11-12. The parties executed a materially identical release in another note modification agreement on June 16, 2017. ECF 66, pp. 4-5.

In 2019, Marco discovered Ms. O'Neill's embezzlement and finally removed her as an authorized signer. ECF 64, p. 17. Marco informed Citizens of the discovery, as well as fraudulent activity by an unrelated third party. *Id.* at pp. 17-19. Even then, Marco alleges that Citizens continued to allow fraudulent checks to clear for several months. *Id.* at pp. 18-19. Throughout the entire period, no one at Citizens discussed the suspected fraud with Mr. Smith. *Id.* at p. 18.

## **PROCEDURAL BACKGROUND**

On February 14, 2020, Marco filed its original complaint, asserting a variety of Pennsylvania statutory and common-law claims, including claims for common-law negligence, statutory negligence, negligent misrepresentation, conversion, and breach of contract. Citizens moved to dismiss, but the Court denied the motion because the motion, as presented, required the Court to examine facts outside of the complaint. ECF 41.

The parties then engaged in discovery, which led to certain discovery disputes, including a dispute over whether the releases barred Marco's post-June 2017 claims. Citizens argued that they did, and therefore refused to produce certain post-2017 information. *See* ECF 57. Citizens also filed a motion for partial judgment on the pleadings, which raised the release issue. ECF 50. Marco moved to strike the motion. ECF 54.

To streamline the disputes, the parties then reached an agreement, which this Court authorized, that mooted the discovery dispute and the motions for judgment on the pleadings and to strike. Instead, Marco would file an amended complaint in which it would plead the existence of the releases and its bases for invalidating the releases. Discovery would be stayed. And Citizens would retain the right to move to dismiss the amended complaint. ECF 62.

Accordingly, on March 5, 2021, Marco filed its amended complaint. ECF 64. Citizens moved to dismiss the amended complaint on the bases of the releases and the signature cards and resolution that gave Ms. O'Neill authorized account access. ECF 65. After the parties briefed the motion, the Court held oral argument and received post-argument supplemental briefs. The motion is now ready for disposition.

## **LEGAL STANDARD**

At the motion-to-dismiss stage, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving

party. *Gross v. German Found. Indus. Initiative*, 549 F.3d 605, 610 (3d Cir. 2008). The factual allegations must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But "[s]o long as the complaint sets forth a 'plausible' claim to relief, defendants' motion to dismiss must fail." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 359 n.5 (3d Cir. 2010).

## DISCUSSION & ANALYSIS

General releases – including of unknown claims, are generally enforceable; the burden of establishing their invalidity lies with the party seeking to avoid their application. *Reed v. SmithKline Beckman Corp.*, 569 F. Supp. 672, 674 (E.D. Pa. 1983) (citations omitted). After considering the parties' arguments and the relevant caselaw, the Court finds that the general releases Marco signed are valid and enforceable. Therefore, the Court will dismiss Marco's claims stemming from conduct that occurred before June 16, 2017. But the signature cards and resolution, on which Citizens relies for dismissal of the post-June 2017 claims, do not absolve it of all other potential liability. As such, the Court will deny Citizens's motion to dismiss as to claims arising after that date.

**I.   The releases bar any claims stemming from events before June 16, 2017.**

"Absent illegality, unconscionableness, fraud, duress, or mistake[,] the parties are bound by the terms of their contract." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) (citations omitted). As part of its contractual relationship with Citizens, Marco's CEO, Martin Smith, signed broad contractual releases on two occasions – on July 10, 2015 and on June 16, 2017. ECF 64, pp. 12, 16. These releases were provisions in two separate loan-modification agreements. Citizens argues that these releases bar any claims Marco may have had before those dates. ECF 66, p. 9. In opposition, Marco argues that these releases "are

unenforceable as any alleged signature of Martin Smith was obtained by Citizens in bad faith." ECF 69, p. 13. The Court agrees with Citizens.

### A. The plain language of the releases bars the pre-June 16, 2017 claims.

In Pennsylvania, "general releases are interpreted by the rules of contract construction." *Bickings v. Bethlehem Lukens Plate*, 82 F. Supp. 2d 402, 405 (E.D. Pa. 2000) (citing *Evans v. Marks*, 218 A.2d 802, 806 (Pa. 1966)). Thus, the release's effect is determined by its language. *Wenger v. Ziegler*, 226 A.2d 653, 654 (Pa. 1967). The ordinary meaning carries the day, unless it appears that the parties intended a different meaning. *Id.*; *Taylor v. Solberg*, 778 A.2d 664, 667 (Pa. 2001).

In relevant part, the 2015 release (ECF 67-6) reads:

> 2.2 <u>Release of the Bank.</u> The Borrower hereby confirms that as of the date hereof it has no claim, set-off, counterclaim, defense, or other cause of action against the Bank including, but not limited to, a defense of usury, any claim or cause of action at common law, in equity, statutory, or otherwise, in contract or in tort, for fraud, malfeasance, misrepresentation, financial loss, usury, deceptive trade practice, or any other loss, damage or liability of any kind, including, without limitation, any claim to exemplary or punitive damages arising out of any transaction between the Borrower and the Bank. To the extent that any such setoff, counterclaim, defense, or other cause of action may exist or might hereafter arise based on facts known or unknown that exist as of this date, such setoff, counterclaim, defense and other cause of action is hereby expressly and knowingly waived and released by the Borrower. The Borrower acknowledges that this release is part of the consideration to the Bank for the financial and other accommodations granted by the Bank in this Agreement.

The corresponding 2017 release provision (ECF 67-7) reads:

> 2.2 <u>Release of the Bank</u>. The Borrower hereby confirms that as of the date hereof it has no claim, set-off, counterclaim, defense, or other cause of action against the Bank, including, but not limited to, a defense of usury, any claim or cause of action at common law, in equity, statutory or otherwise, in contract or in tort, for fraud, malfeasance,

- 6 -

misrepresentation, financial loss, usury, deceptive trade practice, or any other loss, damage, or liability of any kind, including, without limitation, any claim to exemplary or punitive damages arising out of any transaction between the Borrower and the Bank. To the extent that any such set-off, counterclaim, defense, or other cause of action may exist or might hereafter arise based on facts known or unknown that exist as of this date, such set-off, counterclaim, defense and other cause of action is hereby expressly and knowingly waived and released by the Borrower. The Borrower acknowledges that this release is part of the consideration to the Bank for the financial and other accommodations granted by the Bank in this Agreement.

This language unambiguously declares that "the Borrower" has *no* claim or any other type of action – any cause of action is "expressly and knowingly waived and released," whether "based on facts known or unknown that exist as of this date." The plain language does not evince any intent to reserve or exclude any type of claim. In short, the provisions plainly release all of Marco's claims in this case that accrued before June 16, 2017.[1]

Though the plain language generally controls for contract interpretation, Marco argues that releases stand on different footing and should be analyzed differently. Marco argues that to ascertain the parties' intent in a contractual release clause, this Court must instead consider the context of the entire document, including the circumstances surrounding execution of the release. ECF 75, p. 8; ECF 69, p. 13 (citing *Bickings*, 82 F. Supp. 2d at 406). Marco believes that examining the full context will reveal that claims regarding injuries such as Ms. O'Neill's embezzlement could not possibly be "said to have been within the contemplation of the parties when the release was given," and therefore, such claims should proceed despite the releases. ECF 75, p. 4 (citing *Bickings*, 82 F. Supp. 2d at 406).

But Pennsylvania law does not support Marco's mode of interpretation. A release is interpreted like any other contract. Thus, even when a court examines

---

[1] Significantly, both releases also contain integration clauses stating that the writings "constitute the entire agreement" of the parties. ECF 67-6 & 67-7, ¶2.7.

surrounding circumstances, "the primary source of [its] understanding of the parties' intent must be the document itself … as embodied in the ordinary meaning of the words[.]" *Brown v. Cooke*, 707 A.2d 231, 233 (Pa. Super. 1998). Marco's approach contradicts the plain language of the releases, as "a party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim in question." *Jordan v. SmithKline Beecham, Inc.*, 958 F. Supp. 1012, 1019-20 (E.D. Pa. 1997) (citation omitted). Nothing in the language the parties signed suggests an exemption, so the Court cannot carve one out.

### B. Marco cannot invalidate the releases.

Marco argues that this Court should not enforce the releases for at least four separate reasons—none of which are ultimately successful.

First, Marco argues that it did not intend to release claims that it did not know existed. But, again, the releases explicitly waived claims based on facts "known or unknown." When the parties' contract "manifest[s] an intent to settle all accounts, the release will be given full effect even as to unknown claims." *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 (3d Cir. 1975). Indeed, *Bickings*, the very case on which Marco relies, declares that "a release that bars unknown claims will be enforced, even if a party claims that it was unaware of the matter at the time the release was executed." 82 F. Supp. 2d at 406 (citation omitted). Therefore, Marco's lack of awareness of Citizens's alleged negligence does not negate the release.

Second, Marco argues that its claims are exempt from the releases because its causes of action had not yet accrued. ECF 69, p. 14 (citing *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967)). That is, it argues that its causes of action accrued only when it finally discovered Ms. O'Neill's embezzlement – long after the releases had been signed. Marco is right that usually a release cannot bar unaccrued claims – but as the Third Circuit has recognized, that is a rule of construction that can be overcome by the language of the contract. *Three Rivers*, 522 F.2d at 896 ("[G]eneral words of a

release will not usually be construed to bar a claim which had not accrued at the date of the execution of the release, nor a claim, the existence of which was not known to the party giving a release. But, the rule is merely one of construction, and is never applicable to bar a claim where the very language used by the parties excludes its use for that purpose." (citations omitted)).

The releases here are plainly not limited to accrued claims. Quite the opposite: they expressly bar even unaccrued claims, by releasing any "cause of action [that] may exist or might hereafter arise based on facts known or unknown that exist as of this date." That plain language controls. The releases bar Marco's claims, even if Marco didn't discover them, and the claims therefore did not accrue, until years later. *Bickings*, 82 F. Supp. 2d at 408 (finding that "it is immaterial whether [plaintiff's] claim accrued before the Release was executed because the Release precludes claims that are 'unknown' and 'unsuspected'").[2]

Third, Marco argues that the releases were entered into in "bad faith." But there is nothing to support the idea that "bad faith" by a contracting party can invalidate a release. The "bad faith" that Marco seems to allege appears to be no different than a claim of fraudulent inducement – but fraudulent inducement is not

---

[2] Marco relies on *Zinchini v. Jaguar* for support, but its reliance is misplaced. The court in *Zinchini* did decline to enforce a release of "liabilities of any kind or nature, whatsoever, known or unknown[.]" *Zinchini v. Jaguar Land Rover N. Am., LLC*, 2013 WL 12133933, at *1 (W.D. Pa. Mar. 1, 2013), report & recommendation adopted at 2013 WL 12133934. But the injury in that case took place *after* the release at issue. *Id.* at *5. Similarly, in *Vaughn v. Didizian*, the Pennsylvania Superior Court held that a release discharging any possible claims arising from an automobile accident did not bar a medical malpractice action for negligent treatment performed nearly nine months *after* the release. 648 A.2d 38, 39, 41 (Pa. Super. 1994). In contrast, here, Ms. O'Neill had been embezzling from Marco since 2009, and thus the facts – and injuries – giving rise to Marco's pre-2017 claims had been occurring prior to the execution of the releases.

a basis to invalidate a fully integrated release.³ That is, the parties' releases state that they "constitute the entire agreement" of the parties. ECF 67-6 & 67-7, ¶2.7. Under Pennsylvania law, "claims of fraudulent inducement fail where, as here, there is an integration clause in the operative agreement." *Claude Worthington Benedum Foundation v. Bank of New York Mellon Corp.*, 422 F. Supp. 3d 940, 947 (W.D. Pa. 2019) (Ranjan, J.), *aff'd*, 849 F. App'x 36 (3d Cir. 2021). Parol evidence, such as evidence of "bad faith," may not be used to show any false representations that induced the complaining party to agree to the contract. *Yocca,* 854 A.2d at 437 n.26 (cleaned up).

Fourth, Marco argues that it would be unconscionable to enforce the releases because this was not a sophisticated commercial negotiation of parties with equal bargaining power. Marco, as the party challenging the contract provision, bears the burden of proving unconscionability. *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). To invalidate an agreement on this basis, Marco must prove both procedural and substantive unconscionability. *Quilloin v. Tenet HealthSystem*

---

³ Marco claims that the releases were part of a "coordinated clean-up effort" and that Citizens coaxed Mr. Smith into signing them. ECF 64, pp. 11-15. Yet, Marco specifically states that it is not alleging fraud; instead, it couches its claim in the language of "bad faith." ECF 69, pp. 24-25. Whether there is a difference between "bad faith" and fraud in the inducement, neither provides valid grounds for bypassing the release.

On the other hand, parties may introduce parol evidence that there was fraud in the execution of a contract. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437 n.26 (Pa. 2004) (cleaned up). Fraud in the execution is present when "the defrauded party is mistaken as to the contents of the physical document that it is signing." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3d Cir. 1996). In such cases, parol evidence is admissible to show, for example, "that certain provisions were supposed to be in the agreement but were omitted because of fraud, accident, or mistake." *Id.* Again, Marco has disavowed any claims of fraud. Further, there are no allegations that Mr. Smith was unaware of what the release documents contained, or any other allegations that might suggest a basis for fraud in the execution.

*Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)). It has not done so.

"Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Harris*, 183 F.3d at 181. "A contract is procedurally unconscionable where there was a lack of meaningful choice in the acceptance of the challenged provision" such as formation through "oppression and unfair surprise." *Quilloin*, 673 F.3d at 235 (cleaned up). To that end, Marco describes Citizens as "the undeniably more sophisticated party to this transaction." ECF 75, p. 15. Marco alleges that Citizens presented the releases in a "take-it-or-leave-it" fashion and did not afford Marco the opportunity to consult with an attorney before signing. ECF 64, pp. 12 ,16. These arguments miss the mark.

To begin with, Marco is not an unsophisticated party, even if it arguably had less bargaining power here. Disparities in bargaining power alone do not render a contract unconscionable. *Quilloin*, 673 F.3d at 235. There is a "range of ordinary and acceptable bargaining situations[.]" *Id.* (citation omitted). Concerns about power imbalance are more salient when one party is a consumer who lacks business acumen. *See id.* (citation omitted); *Vasilis v. Bell of Pa.*, 598 A.2d 52, 54 (Pa. Super. 1991). Marco, in contrast, is undisputedly a large corporation. While Marco may argue that the releases put it in a less advantageous position, "commercial parties are free to contract as they desire." *Mellon Bank*, 619 F.2d at 1009. This includes the ability to bargain for a release of all possible claims between them. *Crestar Mortg. Corp. v. Shapiro*, 937 F. Supp. 453 (E.D. Pa. 1996). Companies routinely execute releases much like those in this case, and courts in Pennsylvania have equally routinely upheld them, "[h]owever improvident [they] may be or subsequently prove for either party." *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733, 735 (Pa. 1989). Though Marco

may not have been on precisely equal footing with Citizens, it is still a commercial firm that had the capacity to negotiate, even if it did not in fact do so.

Additionally, Marco's own version of events does not describe an unfair surprise or a "take-it-or-leave-it" ultimatum. Citizens previewed modifications to the loan terms over a month before Marco signed the 2015 agreement. ECF 64, p. 11; ECF 75, p. 9. And it sent proposed terms nearly four months before the 2017 modification. ECF 64, pp. 14-15; ECF 75, p. 10. Additionally, the release itself was not unfairly hidden. The modifications were only five and six pages long, respectively. Though the releases were included among 'miscellaneous' provisions, their headings were set off and underlined, just like every other term.

And while Marco claims that it never consulted an attorney, the releases explicitly state that the parties signed "after an opportunity to consult with legal counsel." ECF 67-6 & 67-7, ¶2.16. Therefore, the parol evidence rule again must apply, and the Court cannot credit Marco's assertion. Thus, the Court does not find that Citizens obtained the releases in a procedurally unconscionable manner.

Next, Marco argues that the terms of the releases are substantively unconscionable. The Court again disagrees. "Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris*, 183 F.3d at 181. "To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract itself and determine whether they are so outrageously unfair as to shock the judicial conscience." *Romero v. Allstate Ins. Co.*, 158 F. Supp. 3d 369, 383 (E.D. Pa. 2016) (cleaned up). Marco contends that the release terms are commercially unreasonable because they are "very uncommon in standard bank note forms, except in known 'troubled' situations." ECF 75, p. 19. It also points out that the release is one-sided, not mutual. *Id.* Based on a review of these releases as a whole, however, they do not "shock the conscience," nor are "*grossly* favorable to one side." The

releases themselves may have been one-sided, but the larger deal was not; Marco obtained a significant loan as consideration. ECF 74, p. 29.

Thus, the 2015 and 2017 releases are valid and enforceable. Accordingly, any claims based on conduct that occurred before June 16, 2017 will be dismissed.

**II.   The Court will not dismiss Marco's post-June 2017 claims on the basis of the signature cards and resolution.**

Marco alleges that fraudulent transactions continued until 2019, so the Court's determination regarding the releases does not bar a portion of Marco's claims. ECF 69, p. 9. Still, Citizens argues that Marco's claims should be dismissed in their entirety. ECF 70, p. 10. To support this argument, Citizens included two sets of documents as part of its motion: (1) signature cards designating Ms. O'Neill as an authorized representative of Marco, and (2) a resolution authorizing Ms. O'Neill and ratifying previous transactions. ECF 66. At this preliminary stage of the case, the Court finds that the cards and resolution do not provide an adequate basis to dismiss Marco's remaining claims.

To begin with, the parties dispute whether the Court can consider extraneous documents – the signature cards and resolution – as part of this motion to dismiss. ECF 69, pp. 4-7. They also dispute which signature cards apply; Marco alleges that in addition to the 2014 signature cards presented by Citizens, additional signature cards from 2016 may control. ECF 69, p. 11. Citizens responds that these later cards do not purport to remove Ms. O'Neill as an authorized representative for Marco. ECF 70, p. 6 n.3.

Neither question is dispositive to this motion. Even assuming that the Court can examine the documents, the Court finds that Marco's remaining claims do not depend on the signature cards or resolution. Marco brings claims pursuant to common law and the Pennsylvania Commercial Code. ECF 64, p. 2. It essentially asserts that Citizens breached common law and statutory duties to Marco, and that in breaching

these duties, Citizens failed to follow its own policies and procedures or meet industry standards. *Id.* at 20. According to the amended complaint, in light of Citizens's knowledge of potential fraud with Marco's account, Citizens had the duty to implement fraud detection measures, investigate suspicious activity further, and take remedial measures such as informing other Marco executives of any problems. *Id.* at pp. 20-22.

Put differently, whether Ms. O'Neill was an authorized user or ratified the transactions does not, standing alone, defeat Marco's claims. This is so because Marco alleges that, notwithstanding Ms. O'Neill's status as an authorized user, the law and industry practice imposed additional duties on Citizens to investigate and prevent the fraud. Therefore, the signature cards and resolution are not a complete defense to claims that arose after the releases.[4]

## **CONCLUSION**

For the foregoing reasons, the Court will grant Citizens's motion to dismiss the claims arising before June 16, 2017, but will deny the motion as to the claims based on events occurring after that date. In light of this ruling, the scope of discovery will be limited to information relevant to the post-June 2017 claims. A corresponding order follows.

DATE: November 24, 2021					BY THE COURT:

						/s/ *J. Nicholas Ranjan*
						United States District Judge

---

[4] Citizens also argues that the Court may lack subject matter jurisdiction once the pre-release claims are dismissed because the amount in controversy may dip below $75,000. ECF 66, p. 14 n.11. In diversity cases, however, the amount in controversy is determined at the time of filing. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 290 (1938); *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 395-96 (3d Cir. 2016). Thus, this Court will continue to retain jurisdiction even if the amount in controversy now falls below $75,000.